**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 27, 2023**

# In the Court of Appeals of Georgia

A23A0276. PERSONAL CONCIERGE MD, LLC v. SG ECHO, LLC.

PIPKIN, Judge.

Personal Concierge MD, LLC ("Tenant") appeals the grant of summary judgment to SG Echo, LLC ("Landlord") on Tenant's claims for breach of contract, negligence, negligence per se, nuisance, trespass, attorney fees, and punitive damages; Tenant argues that it, not the Landlord, was entitled to summary judgment or, alternatively, that genuine issues of material fact preclude the grant of summary judgment to either party. We agree that the grant of summary judgment on Tenant's claims for breach of contract and attorney fees must be reversed but otherwise affirm.

The record shows that in 2018, the parties entered into a lease for office space (the "Lease"), designated as Suite 110 ("the Premises"), located in a mixed-use

development known as Echo at North Point in Alpharetta, Georgia.[1] Tenant, through its principle, Dr. Jason Hayes, planned to operate a medical office on the Premises, which was the only use permitted under the Lease. At the time the parties entered into the Lease, the space was unfinished, and it was the responsibility of the Tenant, subject to the payment of an agreed-upon construction allowance from the Landlord, to build out the Premises.

In November 2018, Dr. Hayes noticed water leaking from the ceiling in one of the exam rooms. Dr. Hayes removed the drop down ceiling and noticed dampness and staining; he notified the Landlord, and Harry Hoffer, the Landlord's onsite maintenance manager, investigated the leak. Maintenance workers applied sealant to a bathroom located in an apartment above the Premises and, when no additional leaks were detected, both Landlord and Tenant assumed the leak had been fixed. However, about a week or so later, Dr. Hayes noticed another leak in an adjacent hallway, sometimes referred to in the record as the Dictation area. Hoffer could not immediately determine the source of the leak, and several of the Landlord's representatives, including Robin Riecke, who oversaw Landlord's management team,

---

[1] The term mixed-use refers to a building that is comprised of both living space, such as apartments, and commercial space, such as retail or office space.

2

conducted a visual inspection of the affected area but still could not determine the source of the leak.

Efforts continued to find the source of the leak and sometime around the first week of January, it was determined that multiple layers of sheetrock in the "firewall"[2] ceiling above the Premises needed to be removed to access the pipes in that area. After cutting away four layers of sheetrock in the firewall ceiling, Hoffer identified the source of the leak – a crack in the drain pipe that serviced the apartment above the Premises. Hoffer repaired the pipe on January 8, 2019, and applied Clorox and Kilz to eradicate and prevent the growth of mold.

Several weeks later, Dr. Hayes e-mailed Landlord's representatives about a water stain located between air ducts inside the Premises in the affected area, and he requested that the Landlord treat the stain to prevent mold accumulation. Landlord responded by e-mail the next day, stating that the affected area had in fact been treated and that the area Dr. Hayes was concerned about was simply discolored and cosmetic in nature. Landlord "reminded" Dr. Hayes that "we are responsible for the utilities and areas outside your space. You are responsible for the areas and items

---

[2] The "fire" or "true" ceiling is located above the drop down ceiling and consists of four to five layers of fire-rated sheetrock that takes approximately an hour to burn through.

inside your space . . . regardless of the source of the damage." The e-mail went on to explain that the Landlord had voluntarily treated the areas inside the premises when it repaired the leak but that the Tenant would be responsible for taking any additional measures inside the Premises related to the leak.

In March 2019, Dr. Hayes noticed water on the floor in the Premises' lobby bathroom, and, when he removed the drop down ceiling tiles, he noticed mold. On March 12, 2019, Dr. Hayes e-mailed the Landlord about the leak, noting that the "ceiling and periphery of pipe looks to be riddled with mold." Hoffer went to the Premises to investigate and discovered a slow leak emanating from two pipes that serviced an upstairs apartment that had not been correctly "seated" at the time of the original construction in 2017. Hoffer also observed mold on the sheetrock, and he cut out part of the sheet rock and applied bleach and Mildewcide.

The Landlord contacted the construction company that built the building (the "Builder") to further assess and remedy any damage from the leak; this work was to include removal of any mold that may have resulted from the leak. Riecke notified Dr. Hayes by e-mail on March 14, 2019, that any damage from the leak would be "addressed appropriately" and that the Builder's representative would be out to inspect the area and perform necessary repairs, including mold removal. On March

16, 2019, Riecke sent Dr. Hayes another e-mail, informing him that the Builder's representative had inspected the area inside the ceiling and that the company had contracted with SES Environmental ("SES") to perform any additional work needed to remove and treat any mold or mold-like substance in the affected area of the ceiling. She also told Dr. Hayes that the Builder's representative believed that some if not all of the affected sheetrock in the ceiling would need to be removed but that "the final scope-of-work would be determined by SES[.]"

SES inspected the premises on March 19, 2019 "to check for water stained or damaged interiors, leaks, visible mold growth, and odors." SES treated the area inside the hole that had been cut in the firewall to repair the pipe with chemicals designed to kill and inhibit mold and fungal growth but did not remove or replace any additional sheetrock. SES returned on March 26 to sample for air quality, and, in a report dated April 3, 2019, SES reported that there was no visible mold "inside any of the interior areas inspected" and that the results of air sampling from three points inside the Premises indicated that the mold concentrations inside the Premises were significantly lower than those in the ambient air outside the Premises. The report concluded that "[b]ased on these results and our observations, mold amplification did not appear to be present within the sampled area at the time of [the] assessment."

5

Prior to SES completing its work and testing the air, Dr. Hayes decided to have his own mold inspection performed, and he hired Dr. William F. Kraemer of Atlanta Mold, LLC, to conduct an inspection on March 13, 2019. Dr. Kraemer submitted a report, noting that mold and fungal growth were visible in the layers of the firewall and on the "structural framing material" inside the ceiling of the area affected by the leak. The report recommended further testing to identify the extent of the problem.

Dr. Hayes observed what he believed to be mold near the affected area after SES's remediation, so he hired Healthy Air USA ("Heathy Air") to perform additional mold testing. On April 1, 2019, Healthy Air conducted a mold assessment of the Premises and prepared a "Visual Indoor Air Quality Report" based on its findings. This report, similar to that prepared by Atlanta Mold, contained pictures and verbal findings of observed mold in the area of the firewall ceiling above the bathroom, as well as other places in the affected leak area, and noted contaminated air and surfaces throughout the Premises. The report surmised that the mold throughout the office was an indication that the area inside the ceiling affected by the water leak had not been adequately cleaned or dried.

On April 22, 2019, Tenant sent Landlord a series of e-mails and a letter, which referenced and/or attached the Atlanta Mold and Healthy Air reports, notifying

Landlord that residual mold had been found inside the Premises and in the firewall and the crawl space above the firewall. Tenant noted that, given the dangers of mold, especially to patients with lung conditions and/or who were immunocompromised, Tenant was no longer able to treat patients at the Premises, and that Landlord needed to "re-evaluate and remedy" the mold immediately. The Landlord responded the next day, acknowledging receipt of the reports and reaffirming Landlord's intent to rely on the SES report "given that the test was conducted by a licensed industrial hygienist, which is not the case with the documents you provided." The e-mail went on to state,

> [t]he repair work we completed *within your suite* was voluntary and is not required of us under the terms of the lease. As you were previously advised, in the future, our relationship with you will be governed strictly by the terms of your lease. We have complied with the lease terms and recommend that you file a claim with your insurance carrier if you believe that additional repair work or remediation of some type is needed. (Emphasis supplied.)

Landlord also asked SES to review the Atlanta Mold and Healthy Air reports, and on April 29, 2019, SES provided the Landlord with a "report review" of these reports. SES criticized the credentials of the individuals performing the tests, the methodology used in the testing, and the analytic results contained in the reports. The

7

SES reports' review concluded that "[t]he air in the office building has been deemed wholesome by a diplomate of the American board of industrial hygiene. Review of the reports and analytic results . . . do not dissuade that conclusion." Landlord never returned to the Premises to reinspect the area inside the ceiling that had been impacted by the leak.

On June 4, 2019, Dr. Hayes sent an e-mail to Landlord "as a professional courtesy" informing Landlord that Ensign Building Solutions ("Ensign") would begin performing mold remediation and reconstruction at the Premises in one to two weeks and that the work would last the remainder of June and July. Tenant requested that Landlord inform residents of the ongoing construction and advise them not to use the construction disposal bin for trash. Landlord responded the next day, thanking Tenant for the notification, advising that it would notify its onsite management team, and providing instructions about parking for the contractors, the location of the disposal bin, and the like, and requesting that Tenant keep Landlord "informed on the construction process." Tenant replied the same day, thanking Landlord for "approval for the on-site mold remediation/reconstruction at [the Premises]."

On June 19, 2019, Tenant e-mailed the Landlord requesting the UL Listed Fire rated assembly for the affected ceiling area and the "type" of the construction for the

8

building. The Landlord responded on the same day with a link to the "as-built" plans, and additional e-mails were exchanged concerning the need for the plans containing the ceiling assembly details; these plans were provided to the Tenant on June 24, 2019.

Among other things, Ensign removed drywall, insulation and tiles, "scrubbed" the ceiling area, treated certain areas with fungicides, and reconstructed the area; the total bill for these things was close to $87,000. According to Tenant, these costs, as well as the other expenses it had incurred associated with its efforts to discover and treat the mold totaled $95,925.28. On August 15, 2019, Tenant's attorney sent Landlord a Demand Letter asserting that Landlord was responsible under the terms of the Lease for the amounts expended due to the mold damage, remediation, and rebuild of the affected area inside the ceiling, as well as lost rents from mid-March until the time Dr. Hayes could begin treating patients at the Premises;[3] Tenant demanded Landlord pay $103,673.98, plus attorney fees, within thirty days. Landlord responded on September 13, 2019, "reject[ing] Tenant's demand for payment because

---

[3] Ultimately, Tenant said it was unable to reoccupy the Premises for the intended purpose of treating patients until November 2019 and sought rents totaling $28,255.49.

no remediation was necessary and because Tenant had no right to undertake any work on the exterior of the Premises without Landlord's prior written approval."

On November 27, 2019, Tenant filed suit against Landlord, asserting claims for breach of contract, negligence, negligence per se, nuisance, trespass, attorney fees and punitive damages. Landlord answered, and both parties filed motions for summary judgment. Two hearings were held on the motions, following which the trial court entered an order denying summary judgment to Tenant and granting summary judgment to Landlord on all Tenant's claims. Tenant appeals.

1. Tenant first contends that it, not Landlord, was entitled to summary judgment on its breach of contract claim. We conclude that the trial court did not err by denying summary judgment to Tenant on this claim. However, the judgment in favor of the Landlord on the breach of contract claim must be reversed.

(a) *Mold Remediation Repairs.* In deciding the issues relating to Tenant's breach of contract claim, we keep in mind that "[t]he construction of a lease is a matter for the courts. And we review the lease as a whole, as the rules of contract interpretation require." (Punctuation and footnotes omitted.) *Hancock Fabrics, Inc. v. Alterman Real Estate I, Inc.*, 302 Ga. App. 568, 570 (1) (692 SE2d 20) (2010). Here, we are primarily concerned with Article 7 of the Lease, which governs

"Installation, Maintenance, Operation and Repair." Sections 7.2 and 7.3 set out the primary duties of the Landlord and Tenant when it comes to *maintenance and repairs*. Generally, under Section 7.2, the Landlord is responsible for keeping all structural elements and areas outside the Premises in good condition and repair, while under Section 7.3, the Tenant is generally responsible for all maintenance and repairs inside the Premises, no matter the cause, with the possible exception of latent defects identified within the first year of the Lease as set out in Section 1.1 (m). Additionally, it is worth noting that in demising the Premises to the Tenant, the Landlord specifically "reserve[d] the right to install, maintain, use, repair and replace pipes, cables, duct work, conduits, utility lines and wires through hung ceiling space. . . above or below the Premises, whether serving the Premises or other parts of the Retail Center."

Landlord has never disputed its obligations under the Lease to maintain and make repairs to areas outside the Premises, and has never disputed its obligation to repair the leaky pipes located in the ceiling above the Premises that serviced the upstairs apartments and, where necessary in the affected area of the ceiling, remediate any resulting mold damage. However, Landlord has at all times maintained that Tenant's additional mold remediation measures, including tearing out and rebuilding

11

parts of the ceiling, were unnecessary. Further, Landlord has also consistently maintained that even if additional mold remediation was necessary, it is not obligated to reimburse Tenant for the amounts expended for the remediation because Tenant did not obtain prior written approval for the work– permission that the Landlord says was required by Section 7.1 of the Lease, which also states that even if Tenant had obtained approval for repairs, it would still be responsible for the cost of the repairs. The trial court agreed and granted summary judgment to Landlord on this basis. Tenant challenges this ruling, arguing Section 7.1 does not apply here. We agree.

Section 7.1 governs the "Tenant's Installation of Fixtures and Other Changes," and requires the Tenant to "install first class trade fixtures and equipment required to operates its business." Additionally, that Section sets out what happens to the fixtures, additions, alterations and improvements installed in or made to the Premises at the end of the Lease. Although that section goes on to state that "Tenant shall perform no work to the *exterior or structural system work*, without the prior written approval of the Landlord," and "[a]ny work permitted shall be at Tenant's sole cost and expense. . . ." that language does not appear in isolation; rather, the language appears in the context of the other language of Section 7.1 pertaining to "installation of fixtures and other changes"and no where in Section 7.1 are the terms "repairs" or

"maintenance" mentioned. In our view, the reason for this silence is obvious – as stated above, repairs and maintenance are governed by Sections 7.2 and 7.3, not 7.1, making it the Landlord's duty to make repairs outside the Premises, and Tenant's duty to make repairs inside the Premises. It would make no sense to require the Tenant to seek approval from the Landlord to make repairs outside the Premises when the Landlord, not the Tenant is obligated to make those repairs, and then require the Tenant to shoulder the cost of the repairs it had no responsibility to make. Under well-established rules of contract construction, "the whole contract should be looked to in arriving at the construction of any part, . . . [t]he contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others." (Citations and punctuation omitted.) *Thomas v. B & I Lending, L. L. C.*, 261 Ga. App. 39, 42 (1) (581 SE2d 631) (2003). And "[t]he construction of the contract should give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect."(Citation and punctuation omitted.) Id.

To be clear, nothing we have said here should be read as saying that the Tenant can take on the repair obligations of the Landlord without any notice to the Landlord

13

and then expect the Landlord to pay for the repairs. But that is not what happened here. There is no dispute that the Tenant notified the Landlord that Tenant believed, based on the Atlanta Mold and Healthy Air reports, that additional mold remediation measures needed to be taken, and Landlord refused to make the repairs because, according to the report it received from SES, such remediation was not needed. Likewise, there is no issue as to the Landlord's obligation for repairs in the ceiling above the Premises – the Landlord has never disputed its responsibility to repair and maintain non-Premises areas of the building, including the damaged and/or improperly installed water lines and pipes in the ceiling above the Premises and to remediate any resulting mold resulting from the faulty pipes in the ceiling area *if needed*.[4] Rather, what is very much in dispute in this case is whether the work the Tenant performed in the ceiling above the premises was needed at all, and even if some additional measures were warranted, whether the scope of the work Tenant

---

[4] Although Tenant readily acknowledges its obligation to make repairs inside the Premises, Tenant also alleged in its complaint and makes passing mention in its brief that Landlord was responsible for mold remediation inside the Premises under Section 1.1 (m) of the Lease, which states that Tenant accepts the Premises "as-is, latent defects identified within one (1) year from the date [of the Lease] excepted[.]" The trial court does not mention this section in its summary judgment order or address whether it applies here. Since we are reversing the grant of summary judgment on the breach of contract claim, this issue can be fleshed out upon remand.

performed exceeded what was necessary. It is clear from the record that this material fact must be decided by a jury and, accordingly, summary judgment for the Landlord must be reversed.

(b) *Payment of rent.* Tenant also contends the trial court erred by granting summary judgment to Landlord and not Tenant on its claim for reimbursement of the rent. Tenant claims that under Article 9 of the Lease, which governs Damage and Destruction from Fire, Explosion or Other Casualty, it is entitled to reimbursement of the rent it paid while the Premises was allegedly unusable for the intended purpose as a medical office. The trial court did not separately rule on this aspect of Tenant's breach of contract claim. Accordingly, we remand to the trial court for an initial determination of whether, as Tenant contends, Article 9 of the Lease governing "Casualties," or any other provision of the Lease, authorizes the reimbursement of rent when the Tenant cannot use the Premises for its intended purpose. If that threshold question is answered in the affirmative, then, consistent with Division (1) (a) above, a jury must decide whether the Premises was actually rendered unusable because of mold.[5] Accordingly, the grant of summary judgment to Landlord is

---

[5] Landlord also contends that the voluntary payment doctrine bars this claim. However, Landlord did not assert this as a defense below and we will not consider it.

15

reversed on Tenant's breach of contract claim and the denial of summary judgment to Tenant is affirmed.

2. Tenant also asserted claims for negligence and negligence per se and then filed a Second Amended Complaint to make sure that these claims were understood to be alternative to Tenant's breach of contract claims. Likewise, in its brief on appeal, Tenant states that "either the Lease provisions . . . required Landlord to remediate and reconstruct *or* Tenant should prevail on its negligence and negligence per se claims." Because we held in Division 1 that Landlord had a general duty under the Lease to perform remediation and make repairs in the affected area of the ceiling *provided* such repairs were necessary,[6] the grant of summary judgment in favor of the Landlord on these alternative claims is affirmed.

3. Tenant contends the trial court erred by granting summary judgment on his nuisance claim. Nuisance is defined broadly in Georgia as "anything that causes hurt, inconvenience or damage to another[.]" OCGA § 41-1-1. However, a nuisance cannot be just of the moment. "The whole idea of *nuisance* is that of either a continuous or regularly repetitious act or condition on the subject property." (Citation and

---

[6] Of course, if the trier of fact determines that the repairs and remediation were not necessary, this also would defeat any negligence claims based on failure to repair.

16

punctuation omitted; emphasis in original.) *Blondell v. Courtney Station 300 LLC*, 362 Ga. App. 1, 15 (3) (b) (865 SE2d 589) (2021). Importantly here, an "essential element of nuisance is control over the cause of harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." (Citation and punctuation omitted.) *Sumitomo Corp. of America v. Deal*, 256 Ga. App. 703, 707 (2) (569 SE2d 608) (2002). See also *Bailey v. Anniston Road Baptist Church, Inc.*, 301 Ga. App. 677, 688 (7) (689 SE2d 62) (2009) ("[U]nder Georgia law, liability for a nuisance arises out of responsibility for the continuance or maintenance of a nuisance in addition to the creation of one[.]").

On appeal, Tenant argues that Landlord should be liable for a nuisance because "[t]here is no dispute that Landlord owned and controlled the apartment above the Premises, and there is no dispute the Landlord was responsible for the leaks." While these facts may be true, or somewhat true, in isolation, they do not paint the entire picture. To be sure, the Landlord may have owned and to some extent controlled the apartments above the Premises, and the Landlord was responsible for *repairing the leaks* that originated from outside the Premises. However, there is nothing to show that the Landlord was responsible for the *creation* of the leaks, which were either in existence at the time the Landlord acquired the building or occurred

17

due to the settling of the building, and there is no evidence that Landlord had any knowledge of the leaks until they were reported by Tenant. And while Tenant emphasizes that the leaks were persistent for *months*, no single leak persisted for that long; rather, it was a series of leaks from different sources that were discovered at different times. Further, Landlord did the opposite of continuing or maintaining the leaks – to the contrary, when a leak was discovered, Landlord took action to discover and repair the leak. Landlord neither created, continued or maintained a nuisance, and the trial court did not err in granting summary judgment to Landlord on this claim.

4. Tenant also contends that the trial court erred by granting summary judgment to Landlord on the claim for trespass. As Tenant recognizes in its brief on appeal, a trespass requires an intentional act. See *Rouse v. City of Atlanta*, 353 Ga. App. 542, 546 (2) (a) (839 SE2d 8) (2020) (a trespass must be "an intended act as opposed to a negligent act.") (citation and punctuation omitted). Tenant argues that Landlord's refusal to remediate the mold or send someone to re-inspect the Premises after Tenant notified Landlord on April 22, 2019 that "the mold needs to be removed and remedied immediately" somehow constituted an intentional act in that "Landlord intended continued mold growth above and into the Premises." This argument is untenable. The undisputed evidence shows that Landlord did not return to the Premises because

it relied on what it considered to be a reliable report that the air inside the Premises was safe and that no additional measures were needed to remove or remediate the mold. While the wisdom of that decision may be disputed, there is nothing to suggest that the Landlord intended to maintain or promote mold growth through its actions. The trial court did not err by granting summary judgment on Tenant's claim for trespass.

5. Finally, our reversal of Tenant's breach of contract claim likewise revives his claim for attorney fees under OCGA § 13-6-11. However, as Landlord notes, Tenant's entitlement to these fees is not automatic, as "both the liability for and amount of attorney fees pursuant to OCGA § 13-1-6-11 are solely for the jury's determination[.]" *Covington Square Assoc., LLC v. Ingles Mkt., Inc.*, 287 Ga. 445, 446 (696 SE2d 649) (2010). We affirm, however, the grant of summary judgment on Tenant's claim for punitive damages.

> Punitive damages may be awarded only in such *tort actions* in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

19

(Emphasis supplied.) OCGA § 51-12-5.1. Georgia law is clear that "[u]nless otherwise provided by law, exemplary damages shall never be allowed in cases arising on contracts." OCGA § 13-6-10. "This statutory provision has been interpreted to mean that in action for breach of contract, punitive damages cannot be awarded in the absence of evidence showing tortious conduct on the part of the defendant." *Clayton v. Deverell*, 257 Ga. 653, 655 (5) (362 SE2d 364) (1987). Here, we have affirmed the grant of summary judgment on Tenant's tort claims, leaving extant only his claim for breach of contract. Accordingly, the grant of summary judgment to Landlord on Tenant's punitive damages claim is affirmed.

*Judgment affirmed in part and reversed in part. Rickman, C. J., and Dillard, P. J., concur*.

20